# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## *v.* SHELL OIL CO.

No. 82–825.   Argued October 31, 1983—Decided April 2, 1984

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 82.

*Richard G. Wilkins* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Deputy Solicitor General Wallace, Philip B. Sklover,* and *Vella M. Fink.*

*Robert E. Williams* argued the cause for respondent. With him on the brief were *Douglas S. McDowell, Thomas R. Bagby, W. Stanley Walch, Charles A. Newman,* and *Steven J. Killworth.**

JUSTICE MARSHALL delivered the opinion of the Court.

Section 707(e) of Title VII of the Civil Rights Act of 1964, as amended, authorizes the Equal Employment Opportunity Commission (EEOC) "to investigate and act on a charge" that an employer has engaged in "a pattern or practice" of employment discrimination. Section 706(b) and regulations promulgated thereunder govern the form and content of such a charge and the manner in which the employer should be notified of the allegations of wrongdoing contained therein. The question presented in this case is how much information must be included in the charge and provided to the employer before the Commission may secure judicial enforcement of an administrative subpoena compelling the employer to disclose personnel records and other material relevant to the charge.

---

*Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States by *Cynthia Wicker* and *Stephan A. Bokat;* for the Equal Employment Advisory Council by *Lovic A. Brooks, Jr.;* and for the National Association of Manufacturers by *William E. Blasier* and *Douglas B. M. Ehlke.*

## I

On September 27, 1979, Commissioner Eleanor Holmes Norton, then Chair of the EEOC, issued a sworn charge, alleging that respondent, Shell Oil Co., "has violated and continues to violate Sections 703 and 707 of the Civil Rights Act of 1964, as amended, by discriminating against Blacks and females on the basis of race and sex with respect to recruitment, hiring, selection, job assignment, training, testing, promotion, and terms and conditions of employment." App. to Pet. for Cert. 44a. The charge specified respondent's Wood River Refinery as the locale of the alleged statutory violations. In addition, the charge identified six occupational categories access to which had been affected by racial discrimination and seven occupational categories access to which had been affected by gender discrimination.[1] As originally drafted, the charge did not specify a date on which these alleged unlawful employment practices began. The charge was filed with the St. Louis District Office of the EEOC on October 16, 1979. A copy of the charge, accompanied by a cover letter and a request for various information from the personnel records of the Wood River Refinery, was served on respondent 10 days later.

In the course of discussions with the EEOC over the next several months, respondent took the position that "the charge that has been issued is not supportable by the facts." App. 91. In defense of that position, respondent identified a "multi-county area" surrounding the Wood River Refinery

---

[1] The pertinent sections of the charge provided:

"More specifically, the employer's unlawful discriminatory practices include, but are not limited to:

"1. Failing or refusing to recruit, hire, promote, train, assign or select Blacks for managerial, professional, technical, office/clerical, craft, and service worker positions because of their race.

"2. Failing or refusing to recruit, hire, promote, train, select, and assign females to managerial, professional, technical, craft, operative, laborer and service worker positions because of their sex." App. to Pet. for Cert. 44a.

that, in respondent's view, was the "appropriate local labor market for the Refinery." *Id.*, at 90. Respondent argued that, when the percentages of Negroes and women in the labor market so defined were compared to the percentages of Negroes and women in the overall work force of the refinery (and the percentages of Negroes and women who had recently been hired, promoted, or accepted into the refinery's training programs), it became apparent that respondent was not engaging in systemic discrimination. *Id.*, at 90–91.[2] Respondent submitted some aggregate employment statistics supportive of its arguments but refused to disclose the records and data requested by the EEOC unless and until the Commission answered a series of questions regarding the basis of the charge and furnished information substantiating its answers.

The EEOC took the position that, until it had more evidence, it could not evaluate respondent's contention that the proper labor market constituted not the St. Louis Standard Metropolitan Statistical Area but, rather, the smaller area proposed by respondent. *Id.*, at 95. In answer to respondent's arguments concerning the numbers of Negroes and women employed at the refinery, the EEOC referred respondent to § 16.2 of the EEOC Compliance Manual, which sets forth the standards the Commission has adopted for selecting employers suspected of engaging in systemic employment discrimination. One of the groups targeted for investigation under that provision consists of "employers . . . who employ a substantially smaller proportion of minorities and/or women in their higher paid job categories than in their lower paid job categories."[3] Respondent was thus alerted to the fact that its contentions based upon the percentages

---

[2] Respondent sought to buttress this argument by pointing out: "[T]here have been no race or sex discrimination charges filed against our facility in the last six years. Only two such charges have been filed in the last decade and both of those charges were dismissed." App. 89.

[3] EEOC Compliance Manual § 16.2(c) (1981). The same provision was contained in the 1979 version of the Manual.

of minorities and women in the aggregate work force of the refinery could not conclusively establish its compliance with the EEOC guidelines. On those bases, the EEOC rejected respondent's suggestion that the charge be withdrawn and reiterated the request for information from respondent's files.

When respondent persisted in its refusal to provide the requested data, the EEOC issued a subpoena *duces tecum*, directing respondent to turn over certain information pertaining to its employment practices from 1976 to the present. In accordance with Commission regulations, respondent petitioned the District Director of the EEOC to revoke or modify the subpoena. The District Director altered the subpoena in one minor respect, but otherwise denied relief. The General Counsel of the Commission upheld the decision of the District Director and ordered respondent to comply with the subpoena by September 18, 1980.

Instead of complying, respondent filed suit in the District Court for the Eastern District of Missouri to quash the subpoena and enjoin the Commission's investigation. Respondent alleged, *inter alia*, that the subpoena was unenforceable because the Commission had failed to disclose facts sufficient to satisfy the mandate of § 706(b) of Title VII, 86 Stat. 104, 42 U. S. C. § 2000e–5(b). Subsequently, Commissioner Norton amended the charge to allege that respondent "had engaged in the identified unlawful employment practices on a continuing basis from at least July 2, 1965, until the present."[4] When respondent still refused to comply with the requests for information, the Commission filed an action in the District

---

[4] In explaining the amendment, Commissioner Norton averred that, in the original charge, she had "intended to cover all the unlawful employment practices identified therein occurring from July 2, 1965, continuing through at least the date of the charge," but that, in view of the recent decision of the Court of Appeals for the Ninth Circuit in *EEOC v. Dean Witter Co.*, 643 F. 2d 1334, 1338 (1980) (holding that the charge must contain a "good faith estimate of the probable time periods [involved]"), she thought it prudent to "clarify" the charge by including the date on which she suspected the wrongdoing began. App. to Pet. for Cert. 47a.

Court for the Southern District of Illinois seeking enforcement of the subpoena. That action was transferred to the District Court in Missouri and consolidated with the suit brought by respondent.

The District Court denied respondent's request to block the Commission's inquiry into respondent's records and enforced the subpoena. 523 F. Supp. 79 (ED Mo. 1981). The court reasoned that "[t]he purpose of a charge under section 706 . . . is only to initiate the EEOC investigation, not to state sufficient facts to make out a prima facie case." *Id.*, at 86. On that basis, the court rejected respondent's argument "that the Commissioner's charge does not specify sufficient facts." *Ibid.*[5]

A panel of the Court of Appeals reversed. 676 F. 2d 322 (CA8 1982). The court found that the EEOC had failed to comply with either the provisions of § 706(b) governing the specificity of the notice given an accused employer or the Commission's own regulations governing the contents of a charge. *Id.*, at 325. The court held that the charge and the notice thereof "should at least inform the employer of the approximate dates of the unlawful practices" and should include enough other information to show that those dates have "'some basis in fact.'" *Ibid.* (quoting *EEOC* v. *K–Mart Corp.*, 526 F. Supp. 121, 125 (ED Mich. 1981). In addition, the charge and notice should contain a "statement of the circumstances" of the alleged statutory violations "supported by some factual or statistical basis." 676 F. 2d, at 325–326.[6]

---

[5] The District Court also rejected each of the other arguments advanced by respondent—*e. g.*, that the subpoena violated the Federal Reports Act, 44 U. S. C. § 3501 *et seq.*, and that the request for information was unduly burdensome. 523 F. Supp., at 84–85, 87. Because the Court of Appeals affirmed the District Court's disposition of those issues, 676 F. 2d 322, 326 (CA8 1982), and because respondent has not filed a cross-petition for certiorari, those matters are not before us.

[6] In its original opinion, the Court of Appeals seems to have proceeded on the assumption that Commissioner Norton had filed her charge on behalf of an individual aggrieved party. When informed that the charge

In the court's view, the material provided to respondent in this case failed to satisfy the foregoing standards. The EEOC's petition for rehearing en banc was denied. 689 F. 2d 757 (1982).[7]

We granted certiorari to resolve the confusion in the Courts of Appeals concerning the material that must be included in charges of employment discrimination and notices thereof before the EEOC may obtain judicial enforcement of an administrative subpoena.[8] 459 U. S. 1199 (1983). We now reverse.

## II

### A

Title VII of the Civil Rights Act of 1964, as amended,[9] prohibits various employment practices involving discrimination on the basis of "race, color, religion, sex, or national origin." 42 U. S. C. §§ 2000e–2, 2000e–3. Primary respon-

---

derived from the EEOC's systemic program, the court granted rehearing and modified its opinion in some respects, but adhered to its view that the Commission must specify in some detail the unlawful activities of which the employer is accused and must provide the employer with some of the evidence on which the accusations are founded. See *id.*, at 325, n. 5. Respondent's correspondence with the EEOC makes apparent that its officers have understood from the outset that the charge was based upon statistical manifestations of discrimination derived from the annual reports filed by respondent with the Commission. See App. 92, 157.

[7] Chief Judge Lay dissented from the denial, arguing that the decision of the panel "is supported by neither logic nor precedent, and would severely undermine the Commission's ability to bring commissioner's charges of discriminatory patterns and practices as authorized under 42 U. S. C. § 2000e–5." 689 F. 2d, at 759.

[8] For a variety of recent approaches to this problem, see *EEOC* v. *A. E. Staley Mfg. Co.*, 711 F. 2d 780, 786–787 (CA7 1983), cert. pending, No. 83–401; *EEOC* v. *K–Mart Corp.*, 694 F. 2d 1055, 1063–1064, 1067–1068 (CA6 1982); *EEOC* v. *Bay Shipbuilding Corp.*, 668 F. 2d 304, 312–313 (CA7 1981); *EEOC* v. *Dean Witter Co.*, *supra*, at 1337–1338.

[9] Pub. L. 88–352, Title VII, 78 Stat. 253, as amended by Pub. L. 92–261, 86 Stat. 103, 42 U. S. C. § 2000e *et seq.*

sibility for enforcing Title VII has been entrusted to the EEOC.   § 2000e–5(a).

In its current form, Title VII sets forth "an integrated, multistep enforcement procedure" that enables the Commission to detect and remedy instances of discrimination.   See *Occidental Life Insurance Co. v. EEOC*, 432 U. S. 355, 359 (1977).   The process begins with the filing of a charge with the EEOC alleging that a given employer[10] has engaged in an unlawful employment practice.   A charge may be filed by an aggrieved individual or by a member of the Commission. § 2000e–5(b).   A Commissioner may file a charge in either of two situations.   First, when a victim of discrimination is reluctant to file a charge himself because of fear of retaliation, a Commissioner may file a charge on behalf of the victim. *Ibid.;* 29 CFR §§ 1601.7, 1601.11 (1983).   Second, when a Commissioner has reason to think that an employer has engaged in a "pattern or practice" of discriminatory conduct, he may file a charge on his own initiative.   § 2000e–6(e).

Prior to 1972, different statutory requirements governed charges filed by aggrieved individuals and charges filed by Commissioners.   Aggrieved parties were required simply to state their allegations "in writing under oath."   Pub. L. 88–352, § 706(a), 78 Stat. 259.   By contrast, a Commissioner could file a charge only when he had "reasonable cause to believe a violation of [Title VII] ha[d] occurred," and was obliged to "se[t] forth the facts upon which [the charge was] based."   *Ibid.*[11]   In 1972, as part of a comprehensive set of

---

[10] Although Title VII also covers employment agencies, labor organizations, joint labor-management committees, and government agencies, 42 U. S. C. §§ 2000e, 2000e–2, 2000e–3, we are concerned here only with the provisions applicable to private employers.

[11] A few courts interpreting § 706 prior to the 1972 amendments concluded that the obligation to "se[t] forth the facts upon which [the charge is] based" applied to aggrieved parties as well as Commissioners.   See *Rogers* v. *EEOC*, 454 F. 2d 234, 239 (CA5 1971), cert. denied, 406 U. S. 957 (1972); *Graniteville Co. (Sibley Division)* v. *EEOC*, 438 F. 2d 32, 37–38 (CA4 1971).   Though the outcome of this case in no way turns upon the

amendments to the provisions of Title VII dealing with the EEOC's enforcement powers, Congress eliminated the special requirements applicable to Commissioners' charges. In its present form, § 706(b) of the statute provides simply that "[c]harges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U. S. C. § 2000e–5(b).

As originally enacted, Title VII required the EEOC to provide a copy of a charge to the employer accused of discrimination, but did not prescribe any time period within which the copy was to be delivered. Pub. L. 88–352, § 706(a), 78 Stat. 259. In 1972, Congress altered that provision to require the Commission to "serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on [the] employer . . . within ten days" of the filing of the charge. 42 U. S. C. § 2000e–5(b).

After a charge has been filed, the EEOC conducts an investigation of the allegations contained therein.[12] In connection with its inquiry, the Commission is entitled to inspect and copy "any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by [Title VII] and is relevant to the charge under investigation." § 2000e–8(a). In obtaining such evidence, the Commission may exercise all of the powers conferred upon the National Labor Relations Board by 29 U. S. C. § 161, including the authority to issue administrative subpoenas and to request judicial enforcement of those subpoenas. § 2000e–9. If, after completing its investigation, the EEOC determines that there is "reasonable

---

issue, we think that, fairly read, the provision required only Commissioners to plead such "facts." Cf. *Local No. 104, Sheet Metal Workers* v. *EEOC*, 439 F. 2d 237, 239 (CA9 1971) (adopting the latter construction).

[12] In a case arising in a State that has an enforcement system paralleling that of Title VII, the Commission may not initiate its own investigation until the appropriate state agency has been afforded an opportunity to investigate and resolve the matter. §§ 2000e–5(c), (d).

cause to believe that the charge is true," it must "endeavor to eliminate [the] alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." § 2000e–5(b).[13]   If those methods prove ineffectual, the Commission is empowered to bring a civil action against the employer.   § 2000e–5(f)(1).

At issue in this case is the relationship between three of the steps in the integrated procedure just described: the charge; the notice given to the employer of the allegations against him; and the judicial enforcement of an administrative subpoena of personnel records relevant to the allegations.   It is apparent from the structure of the statute that two of those steps—the charge and the subpoena—are closely related.   As indicated above, the EEOC's investigative authority is tied to charges filed with the Commission; unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction,[14] the EEOC is entitled to access only to evidence "relevant to the charge under investigation."   § 2000e–8(a).

The legislative history makes clear that this limitation on the Commission's authority is not accidental.   As Senators Clark and Case, the "bipartisan captains" responsible for Title VII during the Senate debate, explained in their Interpretative Memorandum:

> "It is important to note that the Commission's power to conduct an investigation can be exercised only after a specific charge has been filed in writing.   In this respect the Commission's investigatory power is significantly narrower than that of the Federal Trade Commission or of the Wage and Hour Administrator, who are author-

---

[13] If the EEOC finds that no such "reasonable cause" exists, it must promptly so inform the employer against whom the charge was made and the person (if any) claiming to be aggrieved.   After receiving such notification, the aggrieved party may file a private action against the employer. § 2000e–5(f)(1).

[14] See, e. g., 15 U. S. C. §§ 43, 46(b) (Federal Trade Commission).

ized to conduct investigations, inspect records, and issue
subpenas, whether or not there has been any complaint
of wrongdoing." 110 Cong. Rec. 7214 (1964) (citations
omitted).

When Congress in 1972 revamped Title VII, it retained the
provision linking the Commission's investigatory power to
outstanding charges, and nothing in the legislative history of
the 1972 amendments suggests that Congress intended to ex-
pand the range of materials to which the Commission could
demand access.

In construing the EEOC's authority to request judicial
enforcement of its subpoenas, we must strive to give effect
to Congress' purpose in establishing a linkage between the
Commission's investigatory power and charges of discrimina-
tion. If the EEOC were able to insist that an employer obey
a subpoena despite the failure of the complainant to file a
valid charge, Congress' desire to prevent the Commission
from exercising unconstrained investigative authority would
be thwarted. Accordingly, we hold that the existence of
a charge that meets the requirements set forth in § 706(b),
42 U. S. C. § 2000e–5(b), is a jurisdictional prerequisite to
judicial enforcement of a subpoena issued by the EEOC.[15]

The relationship between the requirement that an em-
ployer be notified promptly of allegations against it and the
EEOC's subpoena power is less clear. The statutory provi-
sions that define the Commission's investigative authority
do not mention the notice requirement. See §§ 2000e–8,
2000e–9. And nothing in the legislative history of the
sharpened notice provision that was added to § 706 in 1972
suggests that Congress intended or assumed that compliance
therewith was a prerequisite to judicial enforcement of the

---

[15] The same conclusion has been reached by all of the Courts of Appeals
that have considered the matter. See *EEOC* v. *K–Mart Corp.*, 694 F. 2d,
at 1061; *EEOC* v. *Dean Witter Co.*, 643 F. 2d, at 1337–1338; *EEOC* v.
*Appalachian Power Co.*, 568 F. 2d 354, 355 (CA4 1978); *Graniteville
Co. (Sibley Division)* v. *EEOC*, 438 F. 2d, at 35.

Commission's subpoenas.   There is thus substantial reason to doubt whether an employer should be able to resist efforts by the Commission to enforce a subpoena on the ground that the EEOC had not adequately notified the employer of the "date, place and circumstances" of the employer's alleged unlawful employment practices or had not done so within 10 days of the filing of the charge.[16]

For two reasons, however, we decline to decide that troublesome question in this case.   First, all of the parties have assumed that noncompliance with the notice requirement is a legitimate defense to a subpoena enforcement action.[17]   Second, our conclusion that the Commission did comply with the notice provision in this case, see Part II–C, *infra*, renders it unnecessary to determine whether the judgment of the Court of Appeals could withstand scrutiny if the Commission had not done so.   In short, solely for the purpose of our decision

---

[16] One court has suggested that "each one of the deliberate steps in this statutory scheme—charge, notice, investigation, reasonable cause, conciliation—[is] intended by Congress to be a condition precedent to the next succeeding step and ultimately legal action." *EEOC* v. *Container Corp. of America*, 352 F. Supp. 262, 265 (MD Fla. 1972).   However, in one context germane to the problem before us, the lower courts have taken a more forgiving view of the relation between the steps in the Title VII enforcement sequence; when the EEOC has failed to notify the accused employer within 10 days of the filing of the charge, the courts have uniformly held that, at least in the absence of proof of bad faith on the part of the Commission or prejudice to the employer, the result is not to bar a subsequent suit either by the aggrieved party, see, *e. g.*, *Smith* v. *American President Lines, Ltd.*, 571 F. 2d 102, 107, n. 8 (CA2 1978), or by the Commission, see *EEOC* v. *Burlington Northern, Inc.*, 644 F. 2d 717, 720–721 (CA8 1981); *EEOC* v. *Airguide Corp.*, 539 F. 2d 1038, 1042 (CA5 1976).

[17] Thus, at oral argument, the Solicitor General conceded that "the question of whether the circumstances requirement of the statute has been complied with in the notice [may] be raised in a subpoena enforcement proceeding."   Tr. of Oral Arg. 46.   The result of the parties' common assumption is that the issue has not been briefed.   Especially in an area as complex as Title VII enforcement procedure, we are loathe to take an analytical path unmarked by the litigants.

today, we assume that compliance with the notice requirement embodied in § 706(b) is a jurisdictional prerequisite to judicial enforcement of a Commission subpoena.

## B

The statute itself prescribes only minimal requirements pertaining to the form and content of charges of discrimination. Section 706(b) provides merely that "[c]harges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U. S. C. § 2000e–5(b). However, in accordance with the last-mentioned clause, the EEOC has promulgated a regulation that provides, in pertinent part, that "[e]ach charge should contain . . . [a] clear and concise statement of the facts, including the pertinent dates, constituting the alleged unlawful employment practices." 29 CFR § 1601.12(a)(3) (1983).[18] Until rescinded, this rule is binding on the Commission as well as complainants. See *United States* v. *Nixon*, 418 U. S. 683, 695–696 (1974); *Service* v. *Dulles*, 354 U. S. 363, 388 (1957).

There is no question that the charge in this case comported with the requirements embodied in the statute; Commissioner Norton's allegations were made in writing and under oath. The only ground on which the validity of the charge can fairly be challenged is Commissioner Norton's compliance with the Commission's regulation. The Court of Appeals concluded that the charge did not contain enough information to satisfy § 1601.12(a)(3). 676 F. 2d, at 325. To assess that conclusion, we must explicate the crucial portion of the regulation as applied to a charge alleging a pattern or practice of discrimination.[19]

---

[18] An identical regulation was in force at the time the charge in this case was filed. See 29 CFR § 1601.12(a)(3) (1979).

[19] Section 707(e) of the statute, 42 U. S. C. § 2000e–6(e), which authorizes the EEOC "to investigate and act on a charge of a pattern or practice of discrimination," provides that "[a]ll such actions shall be conducted in ac-

Three considerations, drawn from the structure of Title VII, guide our analysis. First, a charge of employment discrimination is not the equivalent of a complaint initiating a lawsuit. The function of a Title VII charge, rather, is to place the EEOC on notice that someone (either a party claiming to be aggrieved or a Commissioner) believes that an employer has violated the title. The EEOC then undertakes an investigation into the complainant's allegations of discrimination. Only if the Commission, on the basis of information collected during its investigation, determines that there is "reasonable cause" to believe that the employer has engaged in an unlawful employment practice, does the matter assume the form of an adversary proceeding.

Second, a charge does have a function in the enforcement procedure prescribed by Title VII. As explained above, the Commission is entitled to access only to evidence "relevant" to the charge under investigation. § 2000e–8. That limitation on the Commission's investigative authority is not especially constraining. Since the enactment of Title VII, courts have generously construed the term "relevant" and have afforded the Commission access to virtually any material that

cordance with the procedures set forth in [§ 706, 42 U. S. C. § ]2000e–5." As indicated in the text, § 706 expressly delegates to the EEOC responsibility to determine the form and content of charges of discrimination. The statutory scheme thus empowers the Commission to promulgate regulations that differentiate between charges alleging individual instances of discrimination and charges alleging patterns or practices of discrimination. The Commission has not exercised that authority. Instead, it has adopted a single regulation, 29 CFR § 1601.12 (1983), applicable to both kinds of charges. The result is considerable awkwardness when complainants try to fit allegations of systemic discrimination into a mold designed primarily for individual claims. Under these circumstances, we can and must try to construe § 1601.12, as applied to systemic charges, in a manner consistent both with the plain language of the rule and with the structure and purposes of Title VII as a whole. But our task would be made significantly easier if the Commission saw fit to adopt special regulations more closely tailored to the characteristics of "pattern-or-practice" cases.

might cast light on the allegations against the employer.[20]   In 1972, Congress undoubtedly was aware of the manner in which the courts were construing the concept of "relevance" and implicitly endorsed it by leaving intact the statutory definition of the Commission's investigative authority.[21]   On the other hand, Congress did not eliminate the relevance requirement, and we must be careful not to construe the regulation adopted by the EEOC governing what goes into a charge in a fashion that renders that requirement a nullity.

Third, it is crucial that the Commission's ability to investigate charges of systemic discrimination not be impaired. By 1972, Congress was aware that employment discrimination was a "complex and pervasive" problem that could be extirpated only with thoroughgoing remedies; "[u]nrelenting broad-scale action against patterns or practices of discrimination" was essential if the purposes of Title VII were to be achieved.[22]   The EEOC, because "[i]t has access to the most current statistical computations and analyses regarding employment patterns" was thought to be in the best position "to determine where 'pattern or practice' litigation is warranted" and to pursue it.[23]   Accordingly, in its amendments to § 707,

[20] See, *e. g.*, *Blue Bell Boots, Inc.* v. *EEOC*, 418 F. 2d 355, 358 (CA6 1969); cf. *Local No. 104, Sheet Metal Workers* v. *EEOC*, 439 F. 2d, at 243 (information regarding pre-1965 practices is relevant to an EEOC inquiry).

Cf. *United States* v. *Arthur Young & Co.*, 465 U. S. 805, 814–815 (1984) (adopting a comparably expansive definition of "relevance" in the analogous context of an IRS subpoena, pursuant to 26 U. S. C. § 7602, of workpapers pertaining to an investigation of the correctness of a tax return).

[21] See *EEOC* v. *Associated Dry Goods Corp.*, 449 U. S. 590, 599–600 (1981); Section-by-Section Analysis of H. R. 1746, 118 Cong. Rec. 7166 (1972) ("In any area where the new law does not address itself, or in any areas where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII").

[22] H. R. Rep. No. 92–238, pp. 8, 14 (1971); see also S. Rep. No. 92–415, p. 5 (1971).

[23] H. R. Rep. No. 92–238, *supra*, at 14.

Congress made clear that Commissioners could file and the Commission could investigate such charges.[24] Our interpretation of the EEOC's regulations should not undercut the exercise of those powers.

With these three considerations in mind, we must assess the proffered interpretations of the requirement embodied in § 1601.12(a)(3) that a Commissioner, when filing a "pattern-or-practice" charge, must state "the facts . . . constituting the alleged unlawful employment practices." One reading of the crucial phrase would impose on the Commissioner a duty to specify the persons discriminated against, the manner in which they were injured, and the dates on which the injuries occurred. But such a construction of the regulation would radically limit the ability of the EEOC to investigate allegations of patterns and practices of discrimination. The Commission has developed a complex set of procedures for identifying employers who may be engaging in serious systemic discrimination. See EEOC Compliance Manual § 16 (1981). The Commission staff reviews the annual reports filed by employers with the EEOC and with the Office of Federal Contract Compliance Programs of the Department of Labor and combines those data with information garnered from other sources regarding employers' practices. *Id.*, §§ 16.3(a), (c). If the resulting composite picture of an employer's practices matches one of a set of prescribed standards,[25] the staff

---

[24] There are indications in the legislative history, see 110 Cong. Rec. 14189 (1964) (remarks of Sen. Pastore), and in the case law, see, *e. g.*, *Local No. 104, Sheet Metal Workers* v. *EEOC*, *supra*, at 240–241, that these powers existed even before 1972. In any event, the amendment to § 707 removed any doubt as to the authority of the EEOC to investigate "pattern-or-practice" charges brought by Commissioners.

[25] The standards themselves are set forth in § 16.2 of the Compliance Manual. Most pertain to disparities between the numbers of women and minorities employed in given positions by a given employer and the numbers available in the pertinent labor pool or the number employed by comparable, nearby employers. The premise of these standards is that nondiscriminatory employment practices will, over time, result in a work

presents a report to a Commissioner, recommending that a charge be filed. *Id.*, §§ 16.3(d), (e). If the Commissioner agrees with the recommendation, he files a sworn charge of systemic discrimination. At that stage of the inquiry, the Commissioner filing the charge has substantial reason, based upon statistical manifestations of the net effects of the employer's practices, to believe that the employer has violated Title VII on a continuing basis. But the Commissioner rarely can identify any single instance of discrimination until the Commission has gained access to the employer's personnel records. Thus, a requirement that the Commissioner in his charge identify the persons injured, when and how, would cut short most of these investigations. That result would be manifestly inconsistent with Congress' intent.

The Court of Appeals adopted a somewhat more moderate construction of the regulation. In that court's view, § 1601.12(a)(3) requires a Commissioner to disclose some portion of the statistical data on which his allegations of systemic discrimination are founded. 676 F. 2d, at 325–326. This interpretation has little to recommend it. The data that undergird the Commissioner's suspicions surely do not "constitute" the alleged unlawful employment practices; the Court of Appeals' proposal is thus unsupported by the plain language of the regulation. More importantly, the court's interpretation is sustained by none of the three pertinent legislative purposes. First, the Court of Appeals' construction would, in effect, oblige the Commissioner to substantiate his allegations *before* the EEOC initiates an investigation, the purpose of which is to determine whether there is reason to believe those allegations are true. Such an obligation is plainly inconsistent with the structure of the enforcement procedure. Second, disclosure of the data on which the

---

force whose composition approximates that of the available labor force, while discriminatory practices will result in a work force in which minorities and women are underrepresented. See *Hazelwood School Dist.* v. *United States*, 433 U. S. 299, 307–308 (1977).

Commissioner's allegations are based would in no way limit the range of materials to which the EEOC could demand access, because, under the statute, the Commission may insist that the employer disgorge any evidence relevant to the allegations of discrimination contained in the charge, regardless of the strength of the evidentiary foundation for those allegations.[26]   Third, the imposition on the EEOC of a duty to reveal the information that precipitated the charge would enable a recalcitrant employer, in a subpoena enforcement action, to challenge the adequacy of the Commission's disclosures and to appeal an adverse ruling by the district court on that issue.   The net effect would be to hamper significantly the Commission's ability to investigate expeditiously claims of systemic discrimination.

Rejection of the two proposals just discussed does not imply that a Commissioner should be permitted merely to allege that an employer has violated Title VII.   Such a result would be inconsistent with the evident purpose of the regulation—to encourage complainants to identify with as much precision as they can muster the conduct complained of. And it would render nugatory the statutory limitation of the Commission's investigative authority to materials "relevant" to a charge.   With these concerns in mind, we think that the

---

[26] Some of respondent's arguments are based on the assumption that a district court, when deciding whether to enforce a subpoena issued by the EEOC, may and should determine whether the charge of discrimination is "well founded" or "verifiable."   See Brief for Respondent 6, 22, 27–28, 30. Nothing in the statute or its legislative history provides any support for this assumption.   The district court has a responsibility to satisfy itself that the charge is valid and that the material requested is "relevant" to the charge, see *supra*, at 65, 68–69, and n. 20, and more generally to assess any contentions by the employer that the demand for information is too indefinite or has been made for an illegitimate purpose.   See *United States* v. *Powell*, 379 U. S. 48, 57–58 (1964); *United States* v. *Morton Salt Co.*, 338 U. S. 632, 652–653 (1950).   However, any effort by the court to assess the likelihood that the Commission would be able to prove the claims made in the charge would be reversible error.

most sensible way of reading the prescription embodied in 29 CFR § 1601.12(a)(3) (1983) in the context of pattern-and-practice cases is as follows: Insofar as he is able, the Commissioner should identify the groups of persons that he has reason to believe have been discriminated against, the categories of employment positions from which they have been excluded, the methods by which the discrimination may have been effected, and the periods of time in which he suspects the discrimination to have been practiced.

The charge issued by Commissioner Norton, as amended, plainly satisfied the foregoing standards. The charge identified Negroes and women as the victims of respondent's putative discriminatory practices. It specified six occupational categories to which Negroes had been denied equal access and seven categories to which women had been denied equal access.[27] It alleged that respondent had engaged in discrimination in "recruitment, hiring, selection, job assignment, training, testing, promotion, and terms and conditions of employment." And it charged respondent with engaging in these illegal practices since at least the effective date of the Civil Rights Act. We therefore conclude that the charge complied with the requirement embodied in § 1601.12(a)(3)

---

[27] See n. 1, *supra*. Commissioner Norton prefaced her identification of these categories with an averment that "[m]ore specifically, [respondent's] unlawful discriminatory practices include, but are not limited to: . . . ." App. to Pet. for Cert. 44a. We do not believe that these introductory phrases rendered meaningless the lists of occupational categories that followed. Rather, we think that the quoted language constituted simply an acknowledgment that the EEOC had statutory authority to inquire into respondent's employment practices pertaining to occupational categories outside of those in which the Commission already had reason to think respondent had been engaging in discrimination, see n. 20, *supra*. By ensuring that respondent was aware of the Commission's expansive investigatory authority, Commissioner Norton made it less likely that respondent would deliberately or inadvertently destroy records relevant to the EEOC's impending investigation, in violation of the Commission's regulations, see n. 35, *infra*.

that a complainant must state "the facts . . . constituting the alleged unlawful employment practices."[28]

## C

To make sense of the notice requirement, embodied in § 706(b), in the context of a charge filed by a Commissioner alleging a pattern or practice of discrimination, we must supplement the considerations discussed thus far with some additional principles and policies. Most importantly, we must strive to effectuate Congress' purpose in incorporating into the statute the current notice provision. Though the legislative history is sparse, the principal objective of the provision seems to have been to provide employers fair notice that accusations of discrimination have been leveled against them and that they can soon expect an investigation by the EEOC. Prior to 1972, the EEOC had become prone to postponing until it was ready to begin an investigation the mandatory no-

---

[28] The EEOC contends that, even if the Court of Appeals had been correct in concluding that the charge failed to comply with § 1601.12(a)(3), the court's conclusion that the charge was invalid would have been erroneous because the charge surely satisfies § 1601.12(b), which provides that, "[n]otwithstanding the provisions of paragraph (a) . . . , a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." In other words, the EEOC contends that, to the extent the injunction embodied in subsection (a)(3) of the regulation gives rise to pleading requirements exceeding those set forth in subsection (b), subsection (a)(3) is merely precatory. The EEOC's interpretation of its own rules is entitled to deference. However, respondent argues with considerable force that the language and context of subsection (b) make clear that it was designed to enable the Commission to proceed with an investigation when an aggrieved layman, unfamiliar with the Commission's regulations, filed a charge that was deficient in some respect, not to excuse a Commissioner from the requirements of subsection (a)(3). In view of our conclusion that Commissioner Norton's charge satisfied § 1601.12(a)(3), we need not resolve this issue. We merely note that this is another instance in which regulations more carefully tailored to the varying characteristics of different kinds of charges would facilitate the task of courts trying to give effect to the Commission's rules. See n. 19, *supra*.

tification to the employer that charges were pending against it.[29] In response to complaints regarding the unfairness of this practice, Congress adopted the present requirement that notice be given to an accused employer within 10 days of the filing of the charge.[30] The requirement that the notice contain an indication of the "date, place and circumstances of the alleged unlawful employment practice" seems to have been designed to ensure that the employer was given some idea of the nature of the charge; the requirement was not envisioned as a substantive constraint on the Commission's investigative authority.[31]

Respondent suggests that, despite the absence of supportive legislative history, we should infer from the structure of the statute, as amended, an intent on the part of Congress to use the notice requirement to limit the EEOC's ability to investigate charges of discrimination. The purpose of the obligation to inform an employer of the "circumstances" of its alleged misconduct, respondent contends, is to force the EEOC "to state the factual basis for its charge," and thereby

---

[29] See *Chromcraft Corp.* v. *EEOC*, 465 F. 2d 745, 747–748 (CA5 1972); B. Schlei & P. Grossman, Employment Discrimination Law 942–943 (2d ed. 1983).

[30] Thus, the section-by-section analysis of S. 2515, from which the notice requirement was derived, explained the provision as follows: "In order to accord respondents fair notice that charges are pending against them, this subsection provides that the Commission must serve a notice of the charge on the respondent within ten days . . . ." 118 Cong. Rec. 4941 (1972).

[31] Thus, for example, the Senate Report described and justified the portion of S. 2515 that ultimately became the notice provision as follows:

"Recognizing the importance that the concept of due process plays in the American ideal of justice, the committee wishes to emphasize certain provisions which are included in the bill to insure that fairness and due process are part of the enforcement scheme.

.     .     .     .     .

"1. . . . The Commission must serve the respondent with a notice of the charge, *which would advise the respondent of the nature of the alleged violation.* As amended by the committee, the bill would require such notice to be served on the respondent within 10 days." S. Rep. No. 92–415, p. 25 (1971) (emphasis added).

to provide a reviewing court with an "objective verifiable method for determining whether [the Commission] ha[s] authority to investigate." Brief for Respondent 30.   Respondent's proposed reconstruction of the reasoning that might have prompted Congress to adopt the notice provision is inconsistent with the pattern and purposes of the 1972 amendments to Title VII.   At the same time it strengthened the notice provision, Congress eliminated the requirement that, before filing a charge, a Commissioner must have "reasonable cause" to believe a violation of Title VII had been committed.   The only plausible explanation for that change is that Congress wished to place a Commissioner on the same footing as an aggrieved private party: neither was held to any prescribed level of objectively verifiable suspicion at the outset of the enforcement procedure.[32]   Rather, the determi-

---

[32] The bill initially passed by the House retained the "reasonable cause" requirement for Commissioners' charges and the requirement that charges filed by aggrieved parties be "in writing under oath."   H. R. 1746, 92d Cong., 1st Sess., § 3(a) (1971).   The version passed by the Senate abandoned the "reasonable cause" requirement for Commissioners' charges and provided that all charges shall be under "oath or affirmation."   S. 2515, 92d Cong., 1st Sess., § 4(a) (1971).   The Conference Committee that reconciled the bills adopted the position taken by the Senate on these two points. S. Conf. Rep. No. 92–681, p. 16 (1972).   The legislative history does not disclose what motivated the Conference Committee to make the choices it did.   Respondent suggests, nevertheless, that we infer from the Committee's adoption of a general requirement that charges be "under oath or affirmation" (in conjunction with the addition of the sharpened notice requirement) an intent on the part of the Committee to retain—indeed to reinforce—"the 'reasonable cause to believe' standard" applicable to Commissioners' charges.   Brief for Respondent 17.

We find respondent's suggestion highly implausible.   It is apparent that the oath requirement on its own cannot bind a Commissioner to an objectively verifiable level of suspicion when filing a charge.   The function of an oath is to impress upon its taker an awareness of his duty to tell the truth, not to oblige him to plead facts having a prescribed evidentiary value.   See E. Cleary, McCormick on Evidence 582 (2d ed. 1972).   In the absence of any evidence that Congress understood there to be a link between the re-

nation whether there was any basis to their allegations of discrimination was to be postponed until after the Commission had completed its inquiries. It is highly unlikely that, having deliberately freed Commissioners from the duty to substantiate their suspicions before initiating investigations, Congress *sub silentio* reinstated that duty by requiring that employers be notified of the "circumstances" of their unlawful employment practices.[33]   Accordingly, we conclude that the specific purpose of the notice provision is to give employers fair notice of the existence and nature of the charges against them.

Finally, in explicating the notice requirement, we must keep in view the more general objectives of Title VII as a whole. The dominant purpose of the Title, of course, is to root out discrimination in employment. But two other policies, latent in the statute, bear upon the problem before us. First, when it originally enacted Title VII, Congress hoped to encourage employers to comply voluntarily with the Act. That hope proved overly optimistic, and the recalcitrance of many employers compelled Congress in 1972 to strengthen the EEOC's investigatory and enforcement powers.[34]   How-

quirement that the *charge* must be "under oath or affirmation" and the new requirement that the *notice* indicate the "date, place and circumstances of the alleged unlawful employment practice," we decline to posit such an unlikely connection.   In sum, we conclude that, by abandoning the "reasonable cause" standard, Congress meant to loosen, not tighten, the constraints on the authority of Commissioners to file charges.

[33] Note that the effect of respondent's reading of the notice provision would be to hold private complainants as well as Commissioners to an objectively verifiable level of "reasonable" suspicion before they could empower the EEOC to proceed with an investigation.   It is undisputed that victims of discrimination were not under such a duty prior to 1972.   In the absence of any supportive evidence in the legislative history, it is hard to believe that Congress meant to create such an important new restriction on the EEOC's enforcement power.

[34] See H. R. Rep. No. 92–238, pp. 3–4, 8–9 (1971); S. Rep. No. 92–415, pp. 4–5, 17 (1971).

ever, Congress did not abandon its wish that violations of the statute could be remedied without resort to the courts, as is evidenced by its retention in 1972 of the requirement that the Commission, before filing suit, attempt to resolve disputes through conciliation. See *Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 228 (1982). Second, the statute contemplates that employers will create and retain personnel records pertinent to their treatment of women and members of minority groups.[35] Both to assist the EEOC in policing compliance with the Act and to enable employers to demonstrate that they have adhered to its dictates, it is important that employers be given sufficient notice to ensure that documents pertaining to allegations of discrimination are not destroyed. See *Occidental Life Insurance Co.* v. *EEOC*, 432 U. S., at 372.

With these considerations in mind, we turn to an assessment of the competing interpretations of the notice provision. It would be possible to read the requirement that the employer be told of "the date, place and circumstances of the alleged unlawful employment practice" as compelling a specification of the persons discriminated against, the dates the alleged discrimination occurred, and the manner in which it was practiced. We reject that construction for the same reason we rejected an analogous reading of 29 CFR § 1601.12 (a)(3) (1983) pertaining to the contents of charges: it would drastically limit the ability of the Commission to investigate allegations of systemic discrimination, and therefore would be plainly inconsistent with Congress' intent. See *supra,* at 70–71.

A more moderate construction of § 706(b) would require the Commission to include in the notice given to the employer

---

[35] Pursuant to the authority conferred upon it by 42 U. S. C. § 2000e–8(c), the EEOC has promulgated 29 CFR § 1602.14 (1983), which requires an employer covered by Title VII to retain all personnel records for six months after they are created and, when a charge of discrimination has been filed against the employer, to retain all records relevant to the charge until the dispute is resolved.

the same information that 29 CFR § 1601.12(a)(3) (1983) (as we have now construed it) presently requires to be included in a charge alleging a pattern or practice of discrimination. See *supra*, at 72–73. That interpretation of the statutory requirement would seem to satisfy all of the pertinent legislative purposes. First, it would provide the employer with fair notice of the allegations against it. Second, by informing the employer of the areas and time periods in which the Commissioner suspects that the employer has discriminated, the notice so construed would enable the employer, if it is so inclined, to undertake its own inquiry into its employment practices and to comply voluntarily with the substantive provisions of Title VII. Finally, notice of this sort would alert the employer to the range of personnel records that might be relevant to the Commission's impending investigation and thus would ensure that those records were not inadvertently destroyed.[36]

Respondent asks us to read the statute to require the EEOC to supplement notification of the kind just described with a summary of the statistical data on which the Commissioner's allegations are founded. We decline the invitation. The data relied upon by the Commissioner are not easily encompassed by the phrase, "date, place and circumstances of the alleged unlawful employment practice"; thus, the plain language of § 706(b) provides little support for respondent's proposed construction. More importantly, respondent's in-

---

[36] This construction of the notice provision gains further credence from its consistency with procedures adopted by the EEOC. The pertinent regulation prescribes that, in the usual case, compliance with the notice requirement is to be achieved by providing the accused employer with "a copy of the charge" within 10 days of its filing. 29 CFR § 1601.14 (1983). Though the regulation contains an exception for cases in which "providing a copy of the charge would impede the law enforcement functions of the Commission," *ibid.*, it does not suggest that the employer is ever entitled to more information than that contained in the charge itself. The Commission's practice, which reflects its interpretation of its statutory obligations, is entitled to deference. See *Oscar Mayer & Co.* v. *Evans*, 441 U. S. 750, 761 (1979); *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 433–434 (1971).

terpretation of the provision would not advance significantly any of the provision's purposes. Disclosure of the statistics relied on by the complainant clearly is not necessary to give the employer fair notice of the allegations against it. Nor would such disclosure aid the employer in identifying and preserving those employment records that might be relevant to the forthcoming EEOC investigation. Finally, revelation of the data on which the Commissioner relied would do little to aid an employer who wished to comply voluntarily with the Act. A good-faith effort to remedy past misconduct and to prevent future violations would require the employer to investigate its prior and current practices in all of the areas identified in the charge; revelation of the evidence that precipitated the charge would not relieve the employer of the duty to conduct such an inquiry. Moreover, most of the data on which a "pattern-or-practice" charge is based are provided by the employer itself in the form of annual reports filed with the EEOC, see 29 CFR §§ 1602.7, 1602.11 (1983); the employer thus cannot plead ignorance of the figures relied upon by the Commissioner. Nor would disclosure of the manner in which the Commission staff analyzed those figures materially assist the employer in complying with the statute, because the purpose of the staff's analysis is not to determine whether and how the employer has committed unlawful employment practices, but rather "to identify situations where the patterns of employment discrimination are the most serious, and where the maintenance of a successful 'systemic case' will have a significant positive impact on the employment opportunities available to minorities and women." EEOC Compliance Manual § 16.1 (1981).[37]

---

[37] To put this last point differently, the objective of the Commission's statistical analyses at this preliminary stage is not to pinpoint aspects of employers' practices that depart from the dictates of Title VII, but simply to locate cases that may entail serious and large-scale violations of the statute. Affording an accused employer access to those analyses would thus do little to assist the employer in bringing itself into full compliance with the law.

Any marginal advantage, in terms of facilitating voluntary compliance by well-intentioned employers, entailed by respondent's proposal would be more than offset by the concomitant impairment of the ability of the EEOC to identify and eliminate systemic employment discrimination. To construe the notice requirement as respondent suggests would place a potent weapon in the hands of employers who have no interest in complying voluntarily with the Act, who wish instead to delay as long as possible investigations by the EEOC. It would always be open to such an employer to challenge the adequacy of the Commission's disclosure of the data on which a charge is founded. If the employer then refused to comply with the Commission's subpoena, a district court would be required to assess the employer's contention before the subpoena could be enforced. The difficulties of making such an assessment responsibly and the opportunities for appeals of district court judgments would substantially slow the process by which the EEOC obtains judicial authorization to proceed with its inquiries.[38]

Accordingly, we construe § 706(b) to require the Commission, within 10 days of the filing of a charge, to reveal to the employer all of the information that must be included in the charge itself under the current version of 29 CFR § 1601.12(a)(3) (1983). Because respondent was provided with a copy of Commissioner Norton's charge 10 days after it was filed with the EEOC, and because the charge itself comported with § 1601.12(a)(3), see *supra*, at 73, we conclude that the notice provision was satisfied in this case.

---

[38] Cf. *FTC* v. *Standard Oil Co. of California*, 449 U. S. 232, 241–243 (1980) (judicial review of early phases of an administrative inquiry results in "interference with the proper functioning of the agency" and "delay[s] resolution of the ultimate question whether the Act was violated").

Note that, in this case, the EEOC's efforts to gain access to respondent's records have been stymied for over three years. We do not mean to imply that respondent falls into the category of recalcitrant employers, but the litigation tactics successfully employed by respondent easily could be put to improper ends.

## III

For the foregoing reasons, we find that all of the strictures embodied in Title VII and in the regulations promulgated thereunder, pertaining to the form and content of a charge of systemic discrimination and to the timing and adequacy of the notice afforded the accused employer, were adhered to in this case. Consequently, the Commission was entitled to enforcement of its subpoena. The Court of Appeals' judgment to the contrary is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, concurring in part and dissenting in part.

I agree with much of what the Court has written. But the Court has deliberately declined to come to grips with the crucial threshold issue in this case: Is inadequate notice a legitimate defense to a subpoena enforcement action brought by the Equal Employment Opportunity Commission (EEOC or Commission)? If it is not, the Court's concern that a meaningful notice requirement would impede the EEOC's investigations is wholly unfounded. The Court clearly suggests it is inclined to answer the question in the negative, see *ante*, at 65–66, 75–77, but then proceeds on the assumption that the question has not been properly presented or briefed. I believe the question is before us and should be addressed.

While respondent Shell Oil Co. (Shell) has maintained throughout that a subpoena may not be enforced if the notice filed in connection with the investigation was unlawful, the EEOC has not conceded the point. In connection with the statement cited by the Court *ante*, at 66, n. 17, the EEOC conceded that questions concerning the adequacy of the notice may be raised at the enforcement proceeding. But I find no clear concession here or in the EEOC's briefs that if

notice is inadequate a district court should then quash the EEOC's subpoena. To the contrary, the entire thrust of the EEOC's position is that investigation should not be postponed for the purpose of weighing the adequacy of the notice. That the EEOC has adamantly maintained that the notice furnished to Shell was in fact lawful need not be read as a concession that, if it had not been, the subpoena would properly have been quashed. The EEOC's view of the link between the adequacy of notice and the enforceability of the subpoena is unquestionably less than crystalline. But in such circumstances the Court is not bound to adopt a reading of the statute that is without sound support in the statutory text.

I agree with the Court that a proper *charge* is a prerequisite to enforcement of an EEOC subpoena. The EEOC has broad flexibility in determining precisely what must be included in the charge. And the charge against respondent Shell was consistent with requirements laid out in the statute and regulations. I therefore agree with the Court's conclusion that the Court of Appeals erred in directing the District Court not to enforce the EEOC's subpoena.

But in my view the Court of Appeals correctly concluded that the notice furnished to Shell was inadequate. The statute makes quite clear that the notice of charge must be more informative than the charge itself. Accordingly, I believe the District Court should enforce the EEOC's subpoena but simultaneously direct the EEOC to furnish Shell with adequate notice of the "date, place and circumstances" of the allegedly unlawful employment practices underlying the charge.

I

Systemic "pattern or practice" discrimination by an employer triggers four separate but coordinated steps by the EEOC. The requirements and purposes of one of these steps—furnishing the employer with notice of a charge—can be understood only in the context of the other three.

*(1) Filing a charge with the Commission.* A charge is a complaint filed with the EEOC "alleging that an employer . . . has engaged in an unlawful employment practice . . . ." 42 U. S. C. § 2000e–5(b). A charge may be filed by "a person claiming to be aggrieved." *Ibid.* Alternatively, a "Commissioner's charge" may be filed when a Commissioner decides to initiate a complaint, usually on the basis of a "pattern or practice" of discrimination. 42 U. S. C. § 2000e–6(e). A Commissioner identifies such instances of "systemic" discrimination by comparing statistics furnished to the Commission by the employer with employment statistics for the market from which the Commissioner believes the employer should be hiring. In either event, a charge is filed with the Commission, not with or against the allegedly discriminating employer. Charges must generally be filed within 180 days after the alleged unlawful employment practice occurred. 42 U. S. C. § 2000e–5(e). The form of a charge is flexible: the statute requires only that "[c]harges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U. S. C. § 2000e–5(b). In the case of a Commissioner's charge the oath or affirmation is made by the EEOC Commissioner who formally reviews the evidence suggesting a pattern or practice of discrimination.

Commission regulations provide that all charges should contain "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices . . . ." 29 CFR § 1601.12(a)(3) (1983). But the regulations go on to state:

> "Notwithstanding the provisions of paragraph (a) of this section, a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of. A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to

clarify and amplify allegations made therein." 29 CFR § 1601.12(b) (1983).

Thus under both the statute and the regulations a charge may be accepted by the Commission even if it lacks a full description of the "date, place and circumstances" of the alleged unlawful employment practices.

Internal EEOC guidelines set out more specific conditions applicable only to a Commissioner's pattern or practice charges. According to § 16 of the EEOC Compliance Manual (1982), reprinted in App. to Pet. for Cert. 40a–43a, the EEOC looks for employers who meet one of six statistical profiles:

(1) employers "who continue in effect policies and practices which result in low utilization of available minorities and/or women";

(2) employers "who employ a substantially smaller proportion of minorities and/or women than other employers in the same labor market who employ persons with the same general level of skills";

(3) employers who employ "a substantially smaller proportion of minorities and/or women" in their higher paid than their lower paid job categories;

(4) employers who maintain recruitment hiring, assignment, promotion, discharge or other policies not justified by business necessity "that have an adverse impact on minorities and/or women";

(5) employers who utilize restrictive employment practices that "are likely to be used as models for other employers"; or

(6) employers who fail to provide available minorities and women with fair access to employment if the employer has "substantial numbers of employment opportunities."

Members of the EEOC staff compile statistics or other factual materials to identify such patterns. The figures are passed through successive stages of staff review within the Commission and finally presented to an EEOC Commissioner, in the form of a "memorandum detailing information

concerning respondent's practices, the reasons for selecting the respondent (including a showing that at least one of the systemic selection standards applies to the respondent), and a description and justification of the proposed scope of the case."[1]   Each recommendation is accompanied by a Commissioner charge ready for signature.

*(2) Notice of the charge.*   Once a charge has been filed with the EEOC, "the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on [the respondent] . . . within ten days . . . ."[2]   42 U. S. C. § 2000e–5(b).   The notice of charge is not the same, nor was it intended to serve the same purpose, as the charge itself.   Before 1972 notice was provided by serving a copy of the charge on the employer, 42 U. S. C. § 2000e–5(a) (1970 ed.), and in 1972 the House bill would have preserved that form of notice.[3]   But the Senate's different view prevailed.   As amended in 1972, 42 U. S. C. § 2000e–5(b) expressly requires more in the notice of charge than in the charge itself.   A charge need only allege an unlawful employment practice and "contain such information and be in such form as the Commission requires." *Ibid.*   Its purpose is prospective—to initiate the investigation, to set out the bounds of the unlawful employment practices that the Commission suspects it may ultimately discover.   A notice of charge, in contrast, must "includ[e] the date, place and circumstances of the alleged unlawful employment practice." *Ibid.*   Its basic purpose is retrospective— to identify what the agency has in hand when it initiates the

---

[1] EEOC Compliance Manual § 16 (1982), reprinted in App. to Pet. for Cert. 43a.

[2] See also 42 U. S. C. § 2000e–5(e).   Similarly, "[i]n the case of any charge filed by a member of the Commission . . . the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials . . . ."   42 U. S. C. § 2000e–5(d).

[3] See H. R. Conf. Rep. No. 92–899, p. 16 (1972).   Before 1972, however, a charge also recited the "facts" of the allegedly discriminatory conduct. 42 U. S. C. § 2000e–5(a) (1970 ed.).

investigation. Thus, absent Commission regulations to the contrary, a charge might satisfy the statutory requirements even if it contained only a naked allegation of a violation of Title VII. The notice of charge would nevertheless have to say more, disclosing the date, place and circumstances of the conduct that triggered the complainant's suspicions in the first place. Commission regulations provide the EEOC with precisely the tools it requires to gather any additional information from the complainant that may be needed to furnish adequate notice to the employer. 29 CFR § 1601.15(b) (1983).

(3) *Investigation of a charge.* The EEOC has the duty to investigate all charges, 42 U. S. C. §§ 2000e–5(b), 2000e–6(e), and to that end it is vested with broad investigatory power:

> "In connection with any investigation of a charge filed under section 2000e–5 of this title, the Commission or its designated representative shall at all reasonable times have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices . . . and is relevant to the charge under investigation." 42 U. S. C. § 2000e–8(a).

Equally important, the EEOC may investigate a pattern or practice charge without making any preliminary finding that there is "reasonable cause" to believe the charge is true. A threshold "reasonable cause" requirement existed before the 1972 amendments,[4] and would have been retained by the

---

[4] The original version of this subsection provided in pertinent part:

"Whenever it is charged in writing under oath by a person claiming to be aggrieved, or a written charge has been filed by a member of the Commission where he has reasonable cause to believe a violation of this subchapter has occurred (and such charge sets forth the facts upon which it is based) that an employer . . . has engaged in an unlawful employment practice, the Commission shall furnish such employer . . . with a copy of such charge and shall make an investigation of such charge, provided that such charge shall not be made public by the Commission." 42 U. S. C. § 2000e–5(a) (1970 ed.).

Senate's bill in 1972. But the House's more liberal position prevailed and is reflected in § 2000e–5(b) as finally enacted.

*(4) Disposition of the charge.* A "reasonable cause" requirement does however remain applicable at the conclusion of the EEOC's investigation. At that stage the Commission must either dismiss the charge or press for a remedy.

Dismissal is required if "there is not reasonable cause to believe that the charge is true." 42 U. S. C. § 2000e–5(b). Again, prompt notice to the respondent is required. *Ibid.*

If, on the other hand, the charge appears to be valid, the Commission must first attempt an informal resolution of the problem. "If the Commission determines after . . . investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." *Ibid.*[5] Only if informal attempts to resolve the problem fail is a civil action by the Commission or the Attorney General in order:

> "If within thirty days after a charge is filed with the Commission or within thirty days after expiration of [time limits as affected by state or local enforcement proceedings] the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action . . . ." 42 U. S. C. § 2000e–5(f)(1).[6]

## II

It is against this statutory background that we must assess the notice the EEOC furnishes to an employer in connection

---

[5] Similarly, the EEOC must grant a State in which the alleged discrimination has occurred "a reasonable time, but not less than sixty days . . . to act under such State or local law to remedy the practice alleged." 42 U. S. C. § 2000e–5(d).

[6] Civil actions alleging pattern or practice discrimination are brought by the Attorney General. The complaint must "se[t] forth facts pertaining to such pattern or practice . . . ." 42 U. S. C. § 2000e–6(a).

with a pattern or practice discrimination charge. On its face, the notice of charge served on Shell contains no information whatsoever concerning the "date, place and circumstances" of the alleged discrimination. App. 62–63. Instead, it refers to a copy of the charge itself, attached to the notice. The charge, for its part, identifies the "place" as Shell's Wood River Refinery, but supplies no "date" for the alleged violations, and includes only the most sweepingly broad and unspecific discussion of the "circumstances" of the alleged discrimination. Without elaboration, the charge alleges Shell's failure "to recruit, hire, promote, train, assign or select Blacks" in six broadly defined job categories, and its failure "to recruit, hire, promote, train, select, and assign females" to seven job categories. App. to Pet. for Cert. 44a. For good measure the charge states that the discriminatory practices "include, but are not limited to" those specified. *Ibid.* Over a year after the notice of the charge was filed, the charge itself was amended to include a "date" for the alleged violations: "from July 2, 1965, continuing through at least the date of the charge." *Id.*, at 47a. It has not escaped notice that July 2, 1965, was the day on which the Civil Rights Act of 1964 became effective.

In my view this brief, formal, and wholly uninformative "charge," appended to an entirely empty "notice," did not comport with the language and purposes of § 2000e-5(b)'s notice requirement. A two-paragraph piece of vacuous legal boilerplate that completely omits the statistical information that the EEOC has in fact relied on in filing the charge serves none of the purposes that underlie the notice requirement.

As a threshold matter, I agree with the Court, *ante*, at 75–77, that the notice provision is not intended to circumscribe the EEOC's investigative authority. The charge, not the notice of the charge, sets the contours of the investigation. But notice to those who are selected as the targets of a Government employment discrimination investigation has been judged by Congress to be desirable in and of itself.

I agree with the Court that a first purpose of the notice provision is "to provide employers fair notice that accusations of discrimination have been leveled against them." *Ante,* at 74. As explained in the Senate Report accompanying the 1972 amendments to Title VII, the notice requirement was "included in the bill to insure that fairness and due process are part of the enforcement scheme," and for the "[p]rotection of [the] rights of [the] respondent."[7] Experience teaches that Government administrative agency investigations can be prone to abuse; they are likely to be conducted more reasonably, more carefully, and more fairly, when the concerned parties are adequately notified of the causes of the investigation that are in progress.

Second, effective notice may conserve both employer and agency resources by moderating the confrontational posture of the investigation and allowing the employer to explain or clarify its position to the EEOC. In addition, as the Court points out *ante,* at 79, notice helps to ensure that documents pertaining to the investigation are preserved.

Finally, and perhaps most importantly, the notice requirement serves a purpose that is central to the statutory scheme—encouraging quick, voluntary, and informal resolution of complaints. I agree with the Court that the notice requirement must be construed so as to advance Congress' desire that the EEOC "attempt to resolve disputes through conciliation." *Ante,* at 78. The Act's overriding goal is not to promote the employment of lawyers but to correct discriminatory practices quickly and effectively. To this end, the EEOC is always required to attempt to resolve charges first through "informal methods of conference, conciliation, and persuasion." 42 U. S. C. § 2000e–5(b). The strict statutory time limits on filing a charge with the Commission, furnishing notice to the respondent of the "date, place and circumstances" of the activities underlying the charge, and

---

[7] S. Rep. No. 92–415, p. 25 (1971).

investigating the charge, appear in the same subsection of the statute and are plainly intended to further the same objective. Adequate notice is especially important with respect to pattern or practice discrimination charges which need not involve intentional or knowing misconduct. See, e. g., *Teamsters* v. *United States*, 431 U. S. 324, 349 (1977).

In light of these purposes, I believe that a notice of charge adequately discloses the "date, place and circumstances of the alleged unlawful employment practice" only when it informs the respondent of the complainant's underlying reasons for filing the charge and is sufficient to permit a well-intentioned respondent to undertake immediate remedial measures if the charge is valid. It is here that I part company with the Court. I have no difficulty concluding that the notice of charge served on Shell did not meet these requirements.

The time period referred to in the EEOC's amendment to the charge can only be characterized as chosen to convey as little information as possible. It appears that the EEOC had in fact relied on Shell's employment statistics for 1970–1977, see Reply Brief for Petitioner 4 (filed Feb. 9, 1983), yet it tardily informed Shell that the "date" of the charge encompassed 1965–1981. And the allegations of discrimination in the notice of charge are so broad and unspecific as to be wholly uninformative. It is almost impossible to imagine what specific remedial actions Shell might have initiated in response to this notice of charge. It is unrealistic to expect a large employer like Shell to build a comprehensive and elaborate remedial program around a general accusation that it has failed "to recruit, hire, promote, train, assign or select" minorities and women in essentially all job categories, when in fact the charge of unlawful discrimination is grounded on far more specific and limited information. The employer surely needs to know which are the greatest problem areas, which time periods gave rise to the most troublesome statistical imbalances, what size program will be needed to rectify

the problem, what labor market the employer is expected to recruit from, and so on. Though the EEOC had carefully marshaled this information before issuing a Commissioner's charge, it categorically refused to disclose any of it to Shell.

The Court's suggestion, *ante*, at 80, that the employer "cannot plead ignorance of the figures relied upon by the Commissioner" is simply mistaken. The employer supplies only one-half of the relevant figures—its own employment statistics. The EEOC supplies the other half—overall statistics for the employment market from which the employer draws. It is only in a comparison between these two sets of figures that a pattern of discrimination becomes apparent. The relevant employment market for comparison was disputed in this case. It seems extraordinary that the EEOC should decline to provide a market definition and the comparative statistics that it works with when any remedial action must involve recruitment in that same market, at a level tailored to the seriousness of the imbalances that the EEOC believes exist at the outset.

In short, I find the EEOC's insistence on secrecy incomprehensible. The notice of charge served on Shell, and the EEOC's subsequent "stonewalling," do not serve the design and purpose of Congress to encourage prompt, voluntary correction of discriminatory employment practices. The notice and other procedural requirements of § 2000e–5(b) demand that the EEOC start with a more informative approach. There is time enough for litigation if the employer proves recalcitrant. At the outset, the EEOC's main interest should be to encourage voluntary remedial action. The statute unambiguously establishes that as the preferred course.

## III

While the notice of charge to Shell was deficient, the Court of Appeals erred in suggesting that the subpoena should not be enforced until the deficiency had been rectified. Title VII places only minimal limits on the Commission's power to gain

access to information: the information must "relat[e] to unlawful employment practices" and be "relevant to the charge under investigation." 42 U. S. C. § 2000e–8(a). The material sought by the EEOC from Shell is clearly "relevant" to the pattern or practice charge that has been filed with the EEOC by Commissioner Norton. The material also "relates to unlawful employment practices" covered by Title VII. Finally, § 2000e–8(a) presupposes that the underlying charge is itself valid. The charge here was accepted by the Commission and is indisputably valid, notwithstanding its generality. As noted *supra*, at 84, the statute vests the Commission with absolute discretion to determine what constitutes a valid charge, and that discretion has not been significantly narrowed by EEOC regulations. The requirements of § 2000e–8(a) were thus fully met.

There is no direct link between the EEOC's subpoena powers and its duty to notify employers of filed charges—the notice of charge does not define the permissible scope of an EEOC investigation. The Commission's strong interest in avoiding a "minitrial" on every discovery request makes it inappropriate for the enforcement of § 2000e–8(a) discovery requests to turn, at the outset, on the EEOC's compliance with § 2000e–5(b)'s notice requirement. I agree with the Court, therefore, that the EEOC's subpoena should have been promptly enforced without more ado.

But I agree with the Court of Appeals that the EEOC has failed to comply with the notice-of-charge requirement. Accordingly, since the issue was properly raised, I believe the EEOC should be informed by the District Court that the notice was inadequate, and directed to furnish better notice. In the unlikely event that the EEOC failed or refused to comply with such an order, the District Court might consider appropriate sanctions. 42 U. S. C. § 2000e–9; 29 U. S. C. § 161.

The District Court's power to order proper notice pendent to its enforcement of the EEOC's subpoena cannot be in

doubt. The District Court clearly has jurisdiction over the subpoena enforcement action brought by the EEOC. 42 U. S. C. §§ 2000e–5(f)(3), 2000e–9; 29 U. S. C. § 161. No principle of ripeness or exhaustion requires the District Court assiduously to ignore the EEOC's violation of the statutory notice requirement while it enforces the EEOC's investigative subpoena. The Court's decision in *FTC* v. *Standard Oil Co. of California*, 449 U. S. 232, 238–245 (1980), is not to the contrary, because there is no adequate substitute for the relief I believe the District Court should give Shell. An important statutory purpose—encouraging prompt, informal resolution of discrimination charges—will be irretrievably undermined if the District Court is barred from considering the adequacy of notice at the same proceeding in which it enforces the EEOC investigative subpoena. The dispute concerning the notice will not be resolvable at later stages of the controversy, and that in itself justifies resolving it at the first available opportunity. Cf. *id.*, at 246. The EEOC apparently does not disagree with the conclusion that the District Court may address the adequacy of notice at a subpoena enforcement proceeding. See *ante*, at 66, n. 17.

Disclosure to the employer of the information relied on by the Commissioner who files a pattern or practice charge does not open the door for litigation by an employer seeking to obstruct or delay the EEOC's investigation: the accuracy or reasonableness of a charge is not a justiciable issue at the investigatory stage. That a charge, or the information on which it is based, is erroneous, inaccurate, incomplete, misleading, false, insufficiently substantiated, outdated, or otherwise unreliable, is not relevant to the enforcement of § 2000e–8(a) subpoenas, providing that the information sought is relevant to the charge filed. The statute is unambiguous: the determination whether there is "reasonable cause" to believe a charge is true is to be made at the conclusion—not at the outset—of an EEOC investigation. With this facet of the law clarified, the EEOC has no legitimate

reason to refuse to disclose the "circumstances" of a pattern or practice charge at the beginning of its investigation.

## IV

In my view, a memorandum "detailing information concerning respondent's practices, the reasons for selecting the respondent (including a showing that at least one of the systemic selection standards applies to the respondent), and a description and justification of the proposed scope of the case," see EEOC Compliance Manual § 16 (1982), would more than satisfy the requirement of fair and meaningful notice. The EEOC Commissioners apparently feel the same way when it is *they* who have to be notified—it is *their* internal guidelines that require the preparation of such a memorandum before a Commissioner will sign a pattern or practice charge. There is absolutely no need or justification for supplying this information to the complainant but concealing it from the employer, who is most able to take positive and prompt remedial action.

Accordingly, I would vacate and remand with instructions that the subpoena be enforced and that the EEOC be directed to provide Shell with meaningful notice of the date and circumstances of the alleged unlawful employment practices.